22CA0975 Peo v Mathews 12-26-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA0975
Arapahoe County District Court No. 19CR2080
Honorable Eric B. White, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Scott Alan Mathews, Jr.,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SCHUTZ
Tow and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 26, 2024

Philip J. Weiser, Attorney General, Sonia Raichur Russo, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Tracy C. Renner, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     Defendant, Scott Alan Mathews, Jr., appeals the trial court's judgment of conviction entered on jury verdicts finding him guilty of second degree murder, menacing, and third degree assault. We affirm the judgment.

## I.     Background and Procedural History

### A.     The Shooting

¶ 2     Jaharie Wheeler lived in an apartment complex with his fiancee, Shamira Cotton, and their respective children. On July 4, 2019, Wheeler prepared for a family barbeque inside their apartment while Cotton and the children played with fireworks in the complex's courtyard.

¶ 3     Cotton briefly left the courtyard and upon her return, learned that Mathews, who also lived in the complex, yelled at the children because the noise from the fireworks agitated his dogs. Mathews and Cotton exchanged insults in the courtyard. Mathews, a Department of Corrections (DOC) officer who had recently returned from a shift, withdrew his gun from its holster and pointed it in Cotton's face in the children's presence. Cotton testified that

1

Katherine,[1] Mathews's wife, intervened and told him to put the gun away. Mathews returned the gun to its holster. The argument escalated into a physical altercation when Mathews headbutted[2] Cotton.

¶ 4     After the headbutt, one of the children went to the apartment to notify Wheeler. Wheeler approached the scene, stepped between Cotton and Mathews, and started yelling at Mathews. As the argument escalated, Wheeler handed his glasses to his son and then stepped toward Mathews while striking him in the face. Mathews immediately responded by pulling his gun and shooting Wheeler point blank in the chest. Wheeler died from his injuries.

### B.     Arrest, Trial, and Conviction

¶ 5     Mathews was arrested and charged with second degree murder, menacing, and third degree assault. He retained private counsel, Selvoy Fillerup, and claimed self-defense. The case was set for trial in February 2020 but continued in January at the prosecution's request because of newly received discovery and the

---

[1] We refer to Katherine by her first name to avoid confusion with Mathews. We mean no disrespect in doing so.
[2] Mathews contends that they headbutted each other.

need to enlist an interpreter's services for witness preparation. Trial was reset for June 2020 but continued by the court in May due to the COVID-19 pandemic. The trial was reset for October 2020. Two weeks before that trial date, Fillerup moved to continue due to the pandemic and newly released discovery.

¶ 6 Trial was reset for March 2021. At the readiness conference, the prosecution announced they were ready for trial. But Fillerup filed a motion to withdraw because he was closing his law firm. He waived speedy trial with Mathews's consent and requested a continuance on his behalf so that Mathews could retain new counsel. The prosecution did not object to the continuance motion but noted Wheeler's family vigorously opposed it.

¶ 7 After a hearing outside the prosecution's presence, Wheeler's mother voiced her family's strong objection to another continuance, noting that they had travelled from out of town for the anticipated trial, missed work, were being denied closure, and were emotionally traumatized by the repeated delays. The trial court expressed its sympathies and apologies to the Wheeler family but stated that it was compelled to grant the defense motions and vacated the trial date to allow Mathews to attempt to retain new counsel.

¶ 8    Mathews immediately filed a motion for court-appointed counsel, stating he was indigent.  The public defender's office reviewed the application and concluded that Mathews's income was above the indigency guidelines, meaning he was not entitled to court-appointed counsel absent that determination being overridden by the trial court.  Mathews made no request that the court override or reconsider the finding of the public defender's office.

¶ 9    At a hearing held in April, Mathews updated the court on his unsuccessful efforts to retain private counsel.  At a hearing in May, Mathews reported that he had called over seventy private attorneys from the trial court's "slow pay/low pay" list[3] but was unable to find counsel he could afford.  At no time during these hearings did Mathews ask the court to reassess his eligibility for court-appointed counsel.

¶ 10    Shortly after the May hearing, Beau Worthington and Brentan Ward (collectively, trial counsel) entered their appearance on

---

[3] This list contains the names of attorneys who will undertake representation at a reduced rate or with a payment plan.

Mathews's behalf. The court set the case for trial on December 7, 2021.

¶ 11     In August 2021, trial counsel moved for the release of state funds to allow them to hire an investigator and expert witnesses to assist in the defense. In mid-September, Mathews filed another application for appointment of the public defender's office and an amended financial statement. He contended that his financial condition had significantly changed because he was separated from Katherine. But the public defender's office again concluded he did not meet the indigency guidelines.

¶ 12     Two days later, Mathews filed yet another application for appointment of the public defender's office, in which he reported materially different financial circumstances than he had just reported. Based on this revised application, the public defender concluded that Mathews was under the indigency guidelines. However, in late September, the public defender's office informed him that he did not otherwise qualify for their services but that the court could override this decision.

¶ 13     In October 2021, trial counsel moved to have the court find Mathews indigent and appoint the public defender's office to

represent him. The court set the matter for a hearing. At the hearing, trial counsel acknowledged the prior failed applications but noted that the court had the authority to override the public defender's determination, deny the motion, or "release funds for an investigator and I think that probably is the most efficient way to handle this matter." Trial counsel then stated,

> Mathews has paid us a total of $4,500 for our services. You know, we were talking about this in the hallway. Mr. Ward and I accepted this case for a number of reasons, money was not one of them. We've basically taken that money and reinvested it in his defense . . . . I'm comfortable . . . with my position as [Mathews's] counsel handling the case even on a pro bono basis even if he doesn't pay me another dime. The problem is he doesn't have the money available to adequately defend against the case like this where there's really a need for an investigator to track down some of these fact witnesses as well and for us to do an independent investigation, and that's really what the issue before the [c]ourt is today.

¶ 14 After hearing counsels' arguments, the court reviewed Mathews's applications and asked him questions about them. The court applied the standards contained in Chief Justice Directive 04-04, Appointment of State-Funded Counsel in Criminal Cases and for Contempt of Court §§ III-IV (amended July 2023) (CJD 04-04) —

6

which governs the appointment of public defenders — and concluded that Mathews's income exceeded 175% of the income eligibility guidelines.

¶ 15 Given these conclusions, the court was reluctant to grant trial counsel's request for the appointment of an investigator at public expense. But the court nonetheless granted the request for the appointment of a private investigator to assist trial counsel with their investigation and preparation for the case. The trial court denied Mathews's motion requesting appointment of the public defender's office.

¶ 16 Six days before trial, Mathews moved for yet another continuance, arguing that counsel needed more time to locate and serve subpoenas on potential witnesses. The prosecutor reported that Wheeler's family strongly objected to another continuance, and the trial court denied the motion. As addressed more fully below, the trial court also denied Mathews's renewed motion to continue asserted on the first day of trial.

¶ 17 The jury found Mathews guilty as charged. The trial court sentenced him to thirty-seven years in DOC custody.

## II. Denial of Court-Appointed Counsel

¶ 18    Mathews argues that reversal is required because the trial court deprived him of his fundamental right to counsel by failing to follow the proper procedures outlined in CJD 04-04 in making its indigency determination and that the failure to provide him with court-appointed counsel resulted in him being forced to proceed with counsel who had a conflict of interest due to Mathews's inability to pay them.  We disagree.

### A.    Standard of Review

¶ 19    A court's indigency determination for purposes of state-funded counsel is reviewable for an abuse of discretion, though it is "subject to careful scrutiny for the reason that it involves a basic constitutional right."  *People v. Greer*, 2022 CO 5, ¶ 19 (citation omitted).  A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair.  *People v. Roybal*, 55 P.3d 144, 150 (Colo. App. 2001).  There is no mechanical test for determining whether the court abused its discretion; rather, the analysis turns on the reasons presented to the judge at the time of the request.  *People v. Hampton*, 758 P.2d 1344, 1353 (Colo. 1988).

¶ 20    Whether a defendant is indigent and therefore entitled to court-appointed counsel presents a mixed question of fact and law. To the extent the ruling requires us to review the trial court's interpretation of CJD 04-04, it presents a question of law that we review de novo. *See Greer*, ¶ 19. To the extent the court's ruling requires us to evaluate the court's factual findings regarding the defendant's income, we review for an abuse of discretion. *People v. Steinbeck*, 186 P.3d 54, 57 (Colo. App. 2007).

### B.    Applicable Law

#### 1.    Sixth Amendment Right to Counsel

¶ 21    All criminal defendants have a constitutional right to effective assistance of counsel. U.S. Const. amend. VI; Colo. Const. art. II, § 16; *Strickland v. Washington*, 466 U.S. 668, 685-86 (1984). Indigent defendants have the right to court-appointed counsel if they are unable to retain private counsel. *People v. Rainey*, 2023 CO 14, ¶ 16. This right encompasses a right to conflict-free representation. *West v. People*, 2015 CO 5, ¶ 15.

¶ 22    When a defendant's ineffective assistance of counsel claim is premised on a conflict of interest, we assess the claim under the standard outlined in *Cuyler v. Sullivan*, 446 U.S. 335, 349 (1980),

rather than *Strickland.* To prevail under this standard, "the defendant must show by a preponderance of the evidence both a conflict of interest *and* an adverse effect resulting from that conflict." *West,* ¶ 65.

¶ 23 A conflict between counsel and a defendant may exist if the defendant is forced to proceed to trial "with an attorney originally hired to represent him but whom he no longer is able to pay." *People v. Munsey,* 232 P.3d 113, 126 (Colo. App. 2009) (citation omitted). But such a conflict presupposes that the retained defense counsel is either unable or unwilling to zealously represent the defendant because of the defendant's existing financial circumstances.

¶ 24 Ultimately, the court's determination of whether counsel is able and willing to fulfill their professional obligations based on the defendant's existing financial circumstances must be based on the professional representations of counsel. Colo. RPC 1.7(2)(b). If counsel represents that they remain able and willing to represent the defendant under the existing financial circumstances, a court does not abuse its discretion by allowing counsel to continue representing the defendant. *See People v. Harlan,* 54 P.3d 871, 877

10

(Colo. 2002) (trial courts have broad discretion to determine whether disqualification is necessary).

## 2. Waiver

¶ 25 Waiver is "the *intentional* relinquishment of a *known* right or privilege." *People v. Rediger*, 2018 CO 32, ¶ 39 (citation omitted). A waiver may be express or it may be implied when a defendant "engages in conduct that manifests an intent to relinquish a right or privilege or acts inconsistently with its assertion." *Forgette v. People*, 2023 CO 4, ¶ 28. The existence of an implied waiver may be based on the totality of the circumstances. *People v. Garcia*, 2024 CO 41M, ¶ 32. If a right is waived, appellate review of the waived right is extinguished. *Forgette*, ¶ 30.

## C. Application

¶ 26 The People argue that Mathews forfeited or waived aspects of his claim that the trial court erred by failing to appoint the public defender's office to represent him in this case. Specifically, they argue that Mathews did not request the court to consider whether he qualified for a public defender because his income was less than 175% of the income eligibility standards. They also argue that Mathews did not request the appointment of a public defender at

11

the October hearing but, rather, limited his request to the appointment of an investigator. But we need not address the People's waiver and forfeiture arguments because Mathews did not meet the eligibility guidelines regardless of any omission by the trial court.

¶ 27 In their appellate brief, the People detail Mathews's reported financial circumstances with respect to the three indigency applications he filed. And the People demonstrate that, even taking his changing financial statements at face value, they fail to demonstrate that Mathews's financial condition ever met the standards of indigency as defined in CJD 04-04. This is true whether the financial determination is based on the poverty guidelines or 175% of those standards. Mathews does not dispute these calculations. Thus, Mathews would not have qualified for court-appointed counsel, and the court did not err by declining his motions for appointment of counsel.

¶ 28 We also reject Mathews's argument that the trial court erred by not appointing him conflict-free counsel. Initially, we reject the premise that trial counsel had a conflict of interest in the first place. Simply because counsel agrees to represent a party at a

substantially discounted rate, or pro bono, it does not necessarily follow that those economic arrangements deprive a party of the right to effective assistance of counsel.

¶ 29    Moreover, even if we grant the assumption that pro bono or reduced fee arrangements subject counsel to the temptation to reduce the quality of their representation to serve their own economic interests, Mathews points to nothing that trial counsel should have done that it did not, or anything that trial counsel did improperly, because they were conflicted by the economic circumstances of the representation.  Indeed, in his reply brief, Mathews concedes that he "cannot point to a specific action taken or not taken by counsel that rendered their assistance ineffective or point to an *actual* conflict of interest."

¶ 30    In sum, Mathews has failed to demonstrate that trial counsel had divided loyalties because of the economic circumstances of their representation or that trial counsel's performance was compromised by such circumstances.  *See Sullivan*, 446 U.S. at 348; *West*, ¶ 40.

## III. Continuance Motion

¶ 31     Mathews contends that the trial court deprived him of his right to present a defense by denying his continuance motion to secure the testimony of three witnesses.  We are not persuaded.

### A. Additional Facts

¶ 32     Six days before trial, trial counsel moved for a continuance on the basis that they had been unable to subpoena three out-of-state witnesses who had not yet been located but who counsel thought could provide testimony that Mathews attempted to de-escalate the confrontation before he shot Wheeler.  Trial counsel indicated that they needed additional time to locate the witnesses' addresses and serve them with subpoenas.  They also indicated that they located another witness, Zachary Akerfelds, who had witnessed the events leading up to the homicide and who they anticipated would provide similar information.

¶ 33     The prosecution noted that this was the fifth trial setting and objected to the continuance on multiple grounds.  It argued that the defense had not established that it exercised due diligence in timely locating these witnesses, observing that Fillerup referred to the need to locate out-of-state witnesses in March, nine months earlier.

14

The prosecution also pointed out the absence of a specific evidentiary offer illustrating that these witnesses were essential. Moreover, the prosecution stated there was alternative evidence that could adequately address Mathews's attempts to de-escalate the situation, including a video of the shooting and the testimony of several available neighbors who also witnessed the shooting. Finally, the prosecution noted that it had flown in multiple witnesses for trial, and that these witnesses would be prejudiced by a continuance.

¶ 34    Emphasizing the repeated continuances and the associated adverse impact on the victims and finding that "the defense is capable of proceeding with what it has," the trial court denied the requested continuance, but noted it would afford trial counsel the opportunity to readdress the issue at trial.

¶ 35    Trial counsel reraised the issue on the first morning of trial. After hearing basically the same arguments from counsel, the court denied the requested continuance based on the following findings:

> It's just too difficult to tell if these witnesses
> have testimony to offer that would be helpful
> such that if I continued the case their
> appearance would allow a more robust defense
> for the defendant, and because there's a

> videotape of at least part of this, it seems to the [c]ourt that at least some of this is going to come out through the videotape, as well as through prosecution witnesses that are available to cross-examine for the defense. I can't make a finding that, again, the evidence that the defense proposes it may be able to produce in the form of this witness testimony would allow the [c]ourt to continue this case for good cause.

¶ 36 The court also noted that it continued to have concerns about the impact that another continuance would cause Wheeler's family.

¶ 37 At trial, the prosecution called Akerfelds as a witness, and he was subject to cross-examination by trial counsel. But his trial testimony did not turn out as trial counsel had forecasted. He was unable to support Mathews's testimony that he and Cotton and headbutted each other. In addition, he testified that Mathews was "even angrier than Cotton" and that his demeanor during the argument was angry and aggressive. Akerfelds also testified that he did not see Cotton do anything physical toward Mathews or Katherine. As it relates to Mathews's interactions with Wheeler, Akerfelds testified that Wheeler did not have anything in his hands and approached Mathews calmly. In sum, Akerfelds did not provide the type of exculpatory testimony defense counsel had anticipated.

16

### B. Standard of Review and Applicable Law

¶ 38 We review an order resolving a continuance motion for an abuse of discretion. *Roybal*, 55 P.3d at 150.

¶ 39 "When the continuance is sought to locate a missing witness, the court may consider whether the movant exercised due diligence to secure the witness's attendance." *People v. Senette*, 2018 COA 105, ¶ 9. "Other factors relevant to the trial court's inquiry include the prejudice the movant would suffer from the denial of a request for a continuance, whether that prejudice would be cured by the continuance, and the prejudice to the nonmoving party if the continuance is granted." *Id.* But "even if the trial court abused its discretion, to obtain a reversal," a defendant must show "actual prejudice arising from denial of the continuance." *People v. Garrison*, 2017 COA 107, ¶ 21 (citation omitted).

### C. Application

¶ 40 Like the trial court, we acknowledge that trial counsel entered their appearance under less-than-ideal circumstances: They only had six months to review the discovery, the investigator had been hired about a month before the trial, and Mathews had limited

financial resources. And we do not see any indication that the requested continuance was sought in bad faith.

¶ 41     But considering the totality of the circumstances, we conclude that the trial court did not abuse its discretion by denying Mathews's continuance request based on the age of the case and the timing of the request. By the time of trial, this case was two and a half years old. It had been continued four times previously. And though some of those continuances were required by the pandemic or the prosecution, others were made at the direct request of Mathews's counsel, including a request that was made and granted just two weeks before the March trial setting.

¶ 42     In addition, Wheeler's family had repeatedly expressed their frustration, financial loss, and emotional turbulence resulting from these continuances. The trial court granted multiple continuances notwithstanding these objections, but the victims' right to have the case promptly resolved was certainly an important criterion for the court to consider. *People v. Ahuero*, 2017 CO 90, ¶ 17.

¶ 43     Against these concerns, the court considered trial counsel's argument that a continuance was necessary to subpoena out-of-state witnesses whose specific location had not yet been identified.

But the court found that trial counsel failed to provide an offer of proof that the proposed testimony would have been distinguishable from other available evidence. Moreover, the subsequent testimony from Akerfelds — one of the witnesses identified by trial counsel as having exculpatory testimony — undermined Mathews's self-defense claim. Furthermore, there was eyewitness testimony from several other witnesses including Katherine, Cotton, and neighbors, and the incident was recorded on video.

¶ 44 Based on these circumstances, the trial court did not abuse its discretion by denying Mathews's continuance motion.

## IV. Prosecutorial Misconduct

¶ 45 Finally, Mathews argues that the prosecutor improperly expressed opinions on Mathews's guilt and credibility. We disagree.

### A. Standard of Review and Applicable Law

¶ 46 In the absence of a contemporaneous objection from defense counsel, as is the case here, we review a trial court's failure to address alleged prosecutorial misconduct for plain error. *People v. Vialpando*, 2022 CO 28, ¶ 20. Plain error is error that is obvious and substantial. *Hagos v People*, 2012 CO 63, ¶ 14. An obvious error is one that contravenes a statute or rule, a well-settled legal

19

principle, or established Colorado case law. *Campbell v. People*, 2020 CO 49, ¶ 25. "An error is substantial if it so undermines the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Deutsch*, 2020 COA 114, ¶ 22.

¶ 47    We engage in a two-step analysis to review prosecutorial misconduct claims. *People v. Herold*, 2024 COA 53, ¶ 67. First, we consider "whether the prosecutor's questionable conduct was improper based on the totality of the circumstances," and then we consider "whether such actions warrant reversal." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 48    During closing argument, a prosecutor "may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006). But it is improper for a prosecutor to use any form of the word "lie" in reference to a defendant's veracity including the words "lies," "lied," and "liar." *Wend*, 235 P.3d at 1096.

## B. Application

¶ 49     Mathews testified at trial. In closing argument, the prosecutor argued that Mathews's account of what happened prior to the homicide was not believable and also that some of his testimony was untruthful. Mathews tries to equate these statements with calling him a liar. Finally, Mathews notes that the prosecutor said on one occasion that he was "so guilty."

¶ 50     The People note that, by testifying, Mathews placed his credibility at issue. *See Walters*, 148 P.3d at 335-36. The People also note that the prosecutor's arguments that Mathews's testimony was not believable or untruthful was grounded in discussions of the applicable evidence and did not use any form of the term "lie." *See People v. McMinn*, 2013 COA 94, ¶ 61 ("Prosecutors may comment on the evidence admitted at trial and the reasonable inferences that can be drawn therefrom.").

¶ 51     We agree with the People that the prosecutor's arguments that Mathews's testimony was unbelievable and untruthful were not improper under the circumstances of this case. And we view the prosecutor saying, "so guilty," in reference to Mathews as somewhat ambiguous. Depending on context, the statement may have been

an improper opinion that the defendant was guilty, *see Robles v. People*, 302 P.3d 269, 279 (Colo. App. 2011) (a prosecutor may not assert a personal opinion as to the defendant's guilt or innocence), *aff'd*, 2013 CO 24, or it may have been a suggestion that the jury should return a guilty verdict based on the evidence the prosecutor summarized before making the statement. In any event, the trial court was in the best position to assess any prejudice associated with the argument, *see People v. Gomez-Garcia*, 224 P.3d 1019, 1024 (Colo. App. 2009), and in context this argument was not so improper or flagrant that it rose to the level of plain error, *see People v. Rhea*, 2014 COA 60, ¶ 43.

## V.     Disposition

¶ 52     The judgment is affirmed.

JUDGE TOW and JUDGE PAWAR concur.